FOREST SERVICE EMPLOYEES
FOR ENVIRONMENTAL ETHICS and
DAPHNE SEWING                                                                 PLAINTIFFS

v.

UNITED STATES FOREST SERVICE                                          DEFENDANT

## MEMORANDUM OPINION

This matter is before the Court upon Plaintiffs, Forest Service Employees for Environmental Ethics ("FSEEE") and Daphne Sewing's, Motion for Summary Judgment (Docket # 23).  The Defendant, United States Forest Service ("Forest Service") has filed a Motion for Cross Summary Judgment (Docket # 33 ).  The Plaintiffs have filed a response (Docket # 36). The Defendant has filed a reply (Docket # 39).  This matter is now ripe for adjudication.  For the following reasons, the Plaintiffs Motion for Summary Judgment is GRANTED in part and DENIED in part.  Defendant's Motion for Cross Summary Judgment is GRANTED in part and DENIED in part.

## BACKGROUND

The Plaintiffs, Forest Service Employees for Environmental Ethics ("FSEEE"), an Oregon corporation, and Daphne Sewing, a Nevada resident and FSEEE member, seek judicial review of the Forest Service's September 21, 2007, decision to authorize the Continued Maintenance of Open Lands ("Project") on the Land Between the Lakes National Recreational Area ("LBL"), under the Administrative Procedure Act ("APA").  Plaintiffs seek to enjoin the implementation of this Project, and to void the Challenge Cost Share Stewardship Agreement ("Stewardship Agreement") between the Forest Service and National Wild Turkey Federation ("NWTF") entered into on January 14, 2008.

On April 30, 2007, the Forest Service released an environmental assessment ("EA") for its Open Lands Project. AR 49-291. After completion of the EA, Decision Notice, and Finding of No Significant Impact ("FONSI"), the documents were approved by the Forest Service. AR 292. FSEEE appealed the April 30, 2007, decision. AR 298-303. In response, the Forest Service withdrew the decision. AR 312. A Revised Environmental Assessment ("REA") was prepared with more in depth consideration of the potential effects of the proposed activities on wildlife resources. AR 325-608; 388-435. On September 21, 2007, the Forest Service issued its open lands decision and FONSI. AR 317-22; 322-324. On October 19, 2007, FSEEE administratively appealed the Forest Service's open lands decision because the proposed pesticide use may have a significant environmental impact on amphibians that must be disclosed in an environmental impact statement ("EIS"). AR 617-23. On December 6, 2007, the Forest Service denied FSEEE's appeal. AR 624-32.

On January 14, 2008, the Forest Service entered into the Stewardship Agreement with the NWTF–a private, non-profit corporation. AR 9003-21. Pursuant to the Stewardship Agreement, the NWTF, in February of 2008, issued permits to several farmers authorizing the farmers to grow corn and soybean corps and cut hay on several thousand acres of LBL land. AR 9022-51. Each of these permits were signed by Robert Abernethy, Director of Agency Programs for the NWTF. Abernethy is not an employee of the Forest Service. FSEEE alleges that at this time, there is no Forest Service-issued special-use permit to farm at LBL as required, yet private commercial farming continues on national forest land.

The Plaintiffs assert that the approval of the Project violated the National Environmental Policy Act ("NEPA"). The Plaintiffs contend that the Forest Service was required to prepare an EIS

instead of relying on the REA.  The Plaintiffs further allege that the Forest Service by implementing the Project through the Stewardship Agreement violated the Organic Administration Act ("OAA") and its implementing regulations.  The Forest Service contends it did not violate the NEPA nor the OAA and argues the Plaintiffs lack standing and have not exhausted their administrative remedies.  Both parties have moved for summary judgment.

## STANDARD

Generally, summary judgment is proper if the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  However, in the case of a district court reviewing final agency action, the rules governing summary judgments do not apply because of the limited role of a court in reviewing the administrative record. *See City of Cleveland v. Ohio*, 508 F.3d 827 (6th Cir. 2007); *North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp.2d 62 (D.D.C. 2007); *J.N. Moser Trucking, Inc. v. U.S. Dept. of Labor*, 306 F. Supp.2d 774 (N.D. Ill. E. Div. 2004) (stating that a district court's opinion on an appeal from a final agency action may be triggered by motions for summary judgment, but the judicial review of an agency's final determination follows standards quite different from those applied in a typical summary judgment proceeding).  When "reviewing administrative agency decisions, the function of the district court is to determine whether or not as a matter of law, evidence in the administrative record permitted the agency to make the decision it did . . . ." *Sierra Club v. Dombeck*, 161 F. Supp.2d 1052, 1064 (D.Ariz. 2001) (citing *City & County of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir.1997)).

The APA states "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be–arbitrary, capricious, an abuse of discretion, or otherwise not

in accordance with law." 5 U.S.C. § 706(2)(a). The APA limits the scope of judicial review to a review of the administrative record only. 5 U.S.C. § 706 ("the court shall review the whole record or those parts of it cited by a party"); *Florida Power & Light Co. v. Lorton*, 470 U.S. 729, 734 (1985); *Camp v. Pitts,* 411 U.S. 138, 142 (1973). Under the "arbitrary and capricious standard, the standard is narrow and the court should not substitute its judgement for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).The court should be particularly deferential to the agency decisions when it implicates substantial agency expertise or regards scientific matters within its area of expertise. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377-78 (1989); *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 103 (1983). While the court is deferential to the agency decision, the agency must still "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (citing *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962). An agency decision would be considered arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*

In sum, in order to "survive summary judgment under the APA, the [party seeking judicial review] must point to facts or factual failings in the administrative record that indicate that the [agency's] decision is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' If the plaintiffs cannot do so, then the [agency's] decision stands." *Shenandoah Ecosystems Defense Group v. U.S. Forest Service*, 144 F. Supp.2d 542, 547 (W.D.Va. 2001).

**DISCUSSION**

**I. Standing**

The question of standing, a threshold question, must be determined by the court before addressing the merits of a cause of action. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The doctrine of standing, establishing a "case or controversy," has developed over the years into a three part test:

> First, the plaintiff must have suffered an "injury in fact"-an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of-the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)(internal citations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* In the case of a motion for summary judgment, the plaintiff must set forth, by affidavit or declaration, specific facts which will be taken as true for the purposes of summary judgment. *Id.*

The Forest Service argues in its Cross Motion for Summary Judgment that FSEEE lacks Article III standing. The Forest Service asserts that the declarations of Daphne Sewing and Mary Courtney Moore are deficient due to their failure to address specifically the 2008 Stewardship Agreement and their failure to show that implementation of the Project would cause them injury in fact. Additionally, the Forest Service asserts that each declaration merely expresses generalized concern with the use of pesticides.

FSEEE addresses only the declaration of Sewing and argues that Sewing states in her declaration that she used to work at LBL; has recreated at LBL; plans specific visits to LBL this winter and next spring; observes and enjoys LBL's amphibians; and is concerned that the Forest

Service's continued used of pesticides at LBL harms amphibians; all of which meet the test for standing. Moore's declaration states that she visits LBL a couple times a year and plans on visiting multiple times in 2009; she travels to LBL to see amphibians and other wildlife; and she is concerned that pesticides will harm the amphibians. Moore also states there are no other places like LBL near her home. FSEEE filed second declarations of Sewing and Moore both mentioning the 2008 Stewardship Agreement and asserting that approval of the Project will cause them injury. The Forest Service maintains that these declarations are deficient for the purpose of standing.

In *Summers v. Earth Island Institute*, cited by the Forest Service, the court found the organization did not have standing when its members planned to visit unnamed Forest Service parks. 129 S.Ct. 1142, 1150 (2009). However, in the case at bar both members whose declarations have been submitted to this Court provided definite plans to visit LBL and stated with particularity that their interest in observing amphibian wildlife would be inhibited both by the 2008 Stewardship Agreement and the implementation of the Project.

The Supreme Court, in *Friends of the Earth, Inc. v. Laidlaw Environmental Services*, stated "[w]e have held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." 528 U.S. 167, 183 (2000) (citing *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). The Plaintiffs in this case have so averred. The Court finds that FSEEE has stated a particularized injury that is imminent; a causal connection between the acts of the Forest Service and the injury caused; and redressibility; thus the requirements of standing are met.

## II. Exhaustion of Administrative Remedies

Under the APA, the doctrine of exhaustion of administrative remedies is only applicable when expressly required by statute or rule. *Darby v. Cisneros*, 509 U.S. 137, 146 (1993). The Department of Agriculture Reorganization Act of 1994 established an express requirement that a litigant exhaust her administrative remedies prior to seeking judicial review under the APA. 7 U.S.C. § 6912(e). Thus, a litigant is barred from seeking APA judicial review of an agency's actions which were not administratively appealed. *Darby*, 509 U.S. at 146. The Forest Service provides for administrative appeals of its decisions. 16 U.S.C. § 1612; 35 CFR 215. While several decisions of the Forest Service are subject to appeal under 36 CFR §215.11, "subsequent implementing actions that result from the initial project decision that was subject to appeal" are not appealable. 36 CFR §215. 12(d). Neither "subsequent implementing actions" nor "initial project decisions" are defined by the regulations.

The Forest Service states that Count 2 of FSEEE's Complaint, concerning violation of the OAA through the Stewardship Agreement, must be dismissed because it was not appealed and therefore the administrative remedies have not been exhausted. The Forest Service does not dispute that as to FSEEE's claim regarding violation of the NEPA, FSEEE has exhausted its administrative remedies by appealing the decision. FSEEE argues that the violation of the OAA is tied to the Open Lands decision dated September 12, 2007, which was timely appealed on October 19, 2007, by the FSEEE, although not by Sewing. FSEEE argues that the Stewardship Agreement, entered into on January 14, 2008, is a subsequent implementing action that resulted form the initial project and therefore is not subject to appeal.

Additionally, FSEEE argues that while Sewing did not appeal the Open Lands decision she has vicarious standing. In the alternative, FSEEE argues that any administrative appeal by Sewing

would have been futile, thus relieving her of the requirement to appeal. FSEEE reasons that had Sewing filed an appeal on the same issues addressed by FSEEE it would have been denied, as the appeal by FSEEE was, therefore failure to appeal creates no bar to this Court's jurisdiction. FSEEE cites *Fallick v. Nationwide Mut. Ins. Co.*, stating "a court is obliged to exercise its discretion to excuse nonexhaustion where resorting to the plan's administrative procedure would simply be futile or the remedy inadequate." 162 F.3d 410, 419 (6th Cir. 1998). The standard for determining futility is whether "clear and positive indication of futility can be made" *Id.* "A plaintiff must show that 'it is certain that his claim will be denied on appeal, not merely that he doubts that an appeal will result in a different decision.'" *Id.* (citations omitted.)

The Court finds that, based on the plain meaning of the regulation, the Stewardship Agreement, is a subsequent implementing act resulting from the initial project decision, the Open Lands decision. As such, the Stewardship Agreement itself was not administratively appealable. The Open Lands decision was appealed by FSEEE who has therefore exhausted all of its administrative remedies as required. Sewing herself did not appeal the Open Lands decision; however, appeal would have been futile as evidenced by denial of FSEEE's appeal and therefore she has standing at this time.

### III. Violation of the NEPA

The National Environmental Policy Act ("NEPA") was established in part "to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man." 42 U.S.C. §4321. The NEPA promotes this purpose "by focusing [g]overnment and public attention on the environmental effects of proposed agency action," not by mandating substantive environmental results. *Marsh*, 490 U.S. at 371.

Under the NEPA, an agency may be required to prepare an Environment Impact Statement

("EIS"), if the impacts of the proposed project are "significant environmental impacts." NEPA

provides in pertinent part:

> The Congress authorizes and directs that, to the fullest extent possible . . . (2) all
> agencies of the Federal Government shall-
> * * *
> (C) include in every recommendation or report on proposals for legislation and other
> major Federal actions significantly affecting the quality of the human environment,
> a detailed statement by the responsible official on-
> (i) the environmental impact of the proposed action,
> (ii) any adverse environmental effects which cannot be avoided should the proposal
> be implemented,
> (iii) alternatives to the proposed action,
> (iv) the relationship between local short-term uses of man's environment and the
> maintenance and enhancement of long-term productivity, and
> (v) any irreversible and irretrievable commitments of resources which would be
> involved in the proposed action should it be implemented.

42 U.S.C. § 4332. However, to decide whether an EIS needs be prepared, the agency may first

prepare an environmental assessment ("EA"). 40 C.F.R. §1501.4. After preparing an EA, an agency

may find that a Finding of No Significant Impact ("FONSI") is all that is necessary to comply with

NEPA, rather than an EIS. *Ohio Valley Environ. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 206

(4th Cir. 2009); *Spiller v. White*, 352 F.3d 235, 237 (5th Cir. 2003). The court in *Spiller* reasoned

that the purpose of the EA was to determine that the project either necessitated further study usually

explored through an EIS, or there was no significant impact and a FONSI would be issued resulting

in no further obligations under the NEPA. *Spiller*, 325 F.3d at 237.

An agency may also issue a mitigating FONSI which sets forth procedures which mitigate

the environmental impact so that it is no longer significant and an EIS is not required. *Ohio Valley*

*Environ. Coalition*, 556 F.3d at 206. The mitigation measures proposed by the agency must be

reasonably developed, although the precise nature of the measures is not required. *National Parks*

*& Conservation Ass'n v. Babbitt*, 241 F.3d 722, 735 (9th Cir. 2001). "A 'perfunctory description,' or 'mere listing of mitigation measures, without supporting analytical data,' is insufficient to support a finding of no significant impact." *Id.* (internal citations omitted). The court, when determining the sufficiency of the mitigation measures, considers "whether they constitute an adequate buffer against the negative impacts that may result from the authorized activity. Specifically, [the court] examine[s] whether the mitigation measures will render such impacts so minor as to not warrant an EIS." *Id.*

Review of an agency decision not to prepare an EIS is reviewable only on procedural grounds. *Id.* at 240. The standard of review is set forth by the APA: whether the actions of the agency were arbitrary and capricious. *Marsh*, 490 U.S. at 375. "NEPA related decisions are accorded a considerable degree of deference" which creates a high bar to success for plaintiffs challenging such actions. *Spiller*, 335 F.3d at 240. A reviewing court, thus has "the 'least latitude in finding grounds for reversal' of an agency decision and 'may not substitute its judgment for that of the agency.'" *Id.* (citations omitted). The role of the reviewing court is limited to ensuring the agency took a "hard look" at the environmental consequences. *Id.*

FSEEE argues that the Forest Service "cannot support a FONSI by relying upon mitigation measures whose effectiveness is unsupported in an administrative record that shows environmental effects . . . are likely significant." FSEEE reasons: 1) pesticide use threatens significant environmental harm to amphibians and there is substantial scientific uncertainty regarding the effects 'many' pesticides used at LBL have on amphibians; 2) the administrative record provides no analytical data showing that mitigation measures will prevent significant adverse effects and ameliorate the data-gaps associated with untested pesticides; and 3) the potential for significant

effects from untested pesticides on amphibians precludes a finding of no significant impact.

FSEEE cites a literature review regarding "pesticide risks to amphibians on LBL" conducted by Katherine Richardson and Steven Bloemer in April of 2007. The review stated that "[a]mphibians, due to their semi-aquatic life history and permeable skin, are considered particularly vulnerable to environmental contamination." AR 3221. The review further stated that "[m]any herbicides used on land at LBL have not been investigated to determine the impact they have on amphibians" and some of the ones investigated have a detrimental impact. *Id.* However, the authors state in conclusion:

> These scientific studies suggest that certain herbicides, if present in the water, have detrimental effects to amphibian larvae. It is then important to prevent applied herbicides from contaminating water. Riparian corridors, agriculture Best Management Practices, and Integrated Pest Management have all be[en] shown to be effective at preventing contamination of aquatic resources. All of these practices are used at LBL. In addition, the amount of croplands on LBL is relatively small. It is unlikely that herbicide use on LBL would result in a decrease of amphibian populations.

*Id.* FSEEE argues that there is no supporting analytical data that the mitigation measures reduce the harm to amphibians to insignificance which requires preparation of an EIS. The Forest Service asserts that the REA is sufficient to comply with the NEPA. The Forest Service contends that this document by Richardson and Bloemer is not the sole basis for the analysis in the September 21, 2007, REA and points to the Risk Assessment by Mistretta. While FSEEE is correct that the "Risk Assessment of Pesticides Proposed for Use in the Land Between the Lakes Openlands Program" by Mistretta did not directly address amphibians or reptiles, the review of Richardson and Bloemer did directly address the risks to amphibians and reptiles as previously stated. Each of these documents is a part of the administrative record and were utilized in reaching the September 21, 2007 decision.

Support for the mitigation measures on which the FONSI is based can be found in the REA.

The REA provides a lengthy analysis focusing on the risk to amphibian populations from fertilizer applications and the effect of pesticide use on wildlife and humans. AR 426-30; 431-35. In discussing implementation of riparian corridors, the REA section concerning reptiles and amphibians cites the Water Resources section which discusses in detail riparian corridors. AR 369. Although the REA cites to no specific data, the statements by the REA are not uncertain as they were in *National Parks & Conservation Ass'n v. Babbitt*. 241 F.3d 722 (9th Cir. 2001).

*Babbitt* involves the decision of the Parks Service to allow increased cruise ship traffic in Glacier Bay National Park. *Id.* In *Babbitt*, the court held that language that the mitigation measures "could reduce . . ." "could mitigate . . ." or "may offset . . . " the damage to the environment was so uncertain as to warrant the preparation of an EIS. *Id.* at 734. The court found that while the Parks Service intended to perform studies to determine the effect of the mitigating factors, it did not intend to do so until after the plan had been implemented which controverted the purpose of the EIS. *Id.* at 734-35. The mitigation measures applied in *Babbitt* had never been used before and both the known effects of increased traffic and the effects of the mitigation measures were uncertain. *Id.* at 735.

*Babbitt* is distinguishable from the case at bar. The mitigation measures intended to be employed by the Forest Service are the same mitigation measures used at LBL previously. LBL currently has riparian corridors ranging in width from 10 to 30 feet and the REA states that the proposed plan will increase the riparian corridors. The REA states " approximately 430 acres of open lands in cultivation (360 acres) and grassland (70 acres) would expand riparian corridors." The REA states in the section concerning vegetation resources that Agriculture Best Management Practices and Integrated Pest Management "have been and would continue to be used in the

management of LBL's open lands." Both the BMPs and IPM are listed in the appendixes to the REA. Due to the experience of the Forest Service in implementing these mitigation techniques at LBL it appears there is little uncertainty they will be effective in minimizing the risk of harm to amphibians and reptiles. The administrative record outlines in detail each of these mitigation measures and it is clear from the record that the Forest Service has sufficient experience with these measures to anticipate their effects.

The mitigation measures proposed by the agency are reasonably developed and more than a perfunctory description or mere listing of mitigation measures has been provided in the administrative record. The Court finds that the mitigation measures will render such impacts from the proposed action so minor as to not warrant an EIS and the decision of the Forest Service in deciding not to prepare an EIS was not arbitrary or capricious nor in violation of the NEPA.

### IV. Violation of the OAA

Creation of forest reserves on public domain lands was first authorized under the Organic Administration Act of 1897 ("OAA").16 U.S.C. § 475 et seq. Today,

> [t]wo venerable statutes set forth the Forest Service's management goals: the Organic Administration Act of 1897, 16 U.S.C. § 475, and the Multiple-Use Sustained-Yield Act of 1960, 16 U.S.C. §§ 528 et seq. The Organic Administration Act instructs the Forest Service to administer national forests so as to secure favorable conditions of water flows and to furnish the country with a continuous supply of timber. The Multiple-Use Sustained-Yield Act adds 'outdoor recreation, range, timber, watershed, and wildlife and fish purposes' to the list of management objectives. In addition, that Act requires the Forest Service to develop and administer the national forests' renewable surface resources 'for multiple use and sustained yield of the several products and services obtained therefrom.'

*Montanans for Multiple Use v. Barbouletos*, 568 F.3d 225, 226-7 ( D.C. Cir. 2009)(internal citations omitted).

Congress adopted the National Forest Management Act of 1976 which "sets forth the

statutory framework and specifies the procedural and substantive requirements under which the Forest Service is to manage the National Forest System lands." *Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008). This Act establishes a two-stage process for the Forest Service to met its goals: first, the Service develops a Land and Resource Management Plan and second, the plan must be revised once every fifteen years. *Montanans*, 568 F.3d at 227. "In developing and maintaining each plan, the Forest Service is required to use 'a systematic interdisciplinary approach to achieve integrated consideration of physical, biological, economic, and other sciences.'" *Id.* at 989 (citing 16 U.S.C. §1604(b)).

In the Wildfire Disaster Recovery Act of 1989, Congress authorized the Secretary of Agriculture to "make such rules and regulations and establish such services as will insure the objects of such [public forests and national forests], namely, to regulate their occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551. Pursuant to the regulations set forth by the Secretary of Agriculture, one must acquire a special-use permit unless the activity is otherwise exempted, e.g., " noncommercial recreational activities, such as camping, picnicking, hiking, fishing, boating, hunting, and horseback riding, or for noncommercial activities involving the expression of views, such as assemblies, meetings, demonstrations, and parades." 36 C.F.R. §251.50. Farming is not an activity specifically exempted from the special use permitting requirement. 36 C.F.R. § 251.50(a) and (c) through (e)(3) (stating "all uses of National Forest System lands, improvements, and resources . . . are designated 'special uses'"). The regulations state that, before conducting a special use, entities must "submit a proposal to the authorized officer and must obtain a special use authorization from the authorized officer." *Id.* An authorized officer is defined as "any employee of the Forest Service to whom has been delegated the authority to

perform the duties described in this part." 36 C.F.R.§ 251.51.

The regulations also provide the Forest Service may impose conditions on the special-use permits and may enact fines or other penalties for violations of the conditions of the permits. 36 C.F.R. §261.10(10). By these means, the Forest Service is able to ensure that the special-use permits protect the public's interests.

In order to better manage the Forest Service properties, Congress authorized the agency to enter stewardship agreements. Congress stated:

> the Forest Service and the Bureau of Land Management [BLM], via agreement or contract as appropriate, may enter into stewardship contracting projects with private persons or other public or private entities to perform services to achieve land management goals for the national forests and the public lands that meet local and rural community needs.

Act of October 21, 1998, Pub. L. 105-277, Sec. 347, 112 Stat. 300 (not codified), as amended, Act of February 20,2003, Pub.L. 108-7, Sec 323, 117 Stat. 275 (not codified). Under this program, the Forest Service and BLM are authorized to enter into multi-year stewardship agreements or contracts and use multiparty monitoring and evaluation processes to access the stewardship projects undertaken by the agencies. *Id.* The Act states that

> [t]he land management goals of a project under subsection (a) [of this note] may include, among other things--
> (1) road and trail maintenance or obliteration to restore or maintain water quality;
> (2) soil productivity, habitat for wildlife and fisheries, or other resource values;
> (3) setting of prescribed fires to improve the composition, structure, condition, and health of stands or to improve wildlife habitat;
> (4) removing vegetation or other activities to promote healthy forest stands, reduce fire hazards, or achieve other land management objectives;
> (5) watershed restoration and maintenance;
> (6) restoration and maintenance of wildlife and fish habitat; and
> (7) control of noxious and exotic weeds and reestablishing native plant species.

*Id.* The only clauses of the Act which address the Act's relation to existing law concern timber sale

advertisement, timber marking, and the distribution of revenues. *Id.* Additionally, the Act sets forth the means for determining the "contracting officer" on behalf of the agency, but does not discuss establishment of an authorized officer as set forth by the Forest Service regulations. *Id.*

The FSEEE asserts that the NWTF-issued special-use permits were not signed by a Forest Service Employee as required by the regulations and, therefore, the terms and conditions of the permits cannot be enforced by the Forest Service. FSEEE argues that because the Stewardship Agreement authorizes NWTF to regulate the use and occupancy of LBL for farming or any other purpose, the Stewardship Agreement violates the Secretary's special-use permit rules established under the OAA and, thus, should be set aside by this Court.

The Forest Service argues that the regulations regarding special-use permits do not apply to the Stewardship Agreement. The Forest Service reasons that the special-use permits regulate the relationship between the agency and the permittee analogous to a landlord-tenant relationship, while the Stewardship Agreement does not create this type of relationship. The Forest Service next asserts that the NWTF contracts with farmers are not special-use permits; however, the Forest Service does not support this argument with more than a conclusory statement.

The Court finds these assertions incorrect. While the Forest Service is correct the special-use regulations never purport to be applicable to the Stewardship Act, the regulations regarding special use permits are applicable to all uses of Forest Service lands not otherwise exempted. 36 C.F.R. 251.50. The Forest Service is authorized by Congress to enter a stewardship agreement with a private entity to reach its land management goals; however, this does not alter the requirement of a special-use permit by others to use Forest Service lands. The special-use permit is still required to govern the relationship between the Forest Service, as self described landlord, and the farmers

or permittees, described as tenants.   The regulations unambiguously state that a special use permit is required for all actions on Forest Service lands that are not specifically exempted by other statutes or regulations. *Id.*   As set forth, farming is not specifically exempted.  *Id.* The Court finds a special-use permit is required for farming on the LBL lands regardless of the Stewardship Agreement.

Additionally, the Court finds that the NWTF "contracts" with farmers are special-use permits.  While this term was not defined in the statute, it appears from the plain meaning of the documents that these "contracts" were intended to be special-use permits. The language in the introductory portion of the document setting forth the scope defines the document as a "permit"and the document is referred to as a permit throughout. AR 9023.  Additionally, the permit is issued for specific purposes and to be applied "in accordance with the attached Operation and Management Plan." *Id.* The Annual Operations and Management Plan is found at the conclusion of the Stewardship Agreement and it refers to the relationship between the NWTF and "the permittee." AR9107-23  Based on this plain language, it appears all parties to these agreements intended the contracts between the farmers and the NWTF to be special-use permits.

The FSEEE further argues that under the delegation doctrine, it is unlawful for the Forest Service to delegate the protection of the environment to private entities.  FSEEE cites several cases for the principle that an agency can not delegate the protection of the environment to private entities through agreements such as the Stewardship Agreement at issue here.

In *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 955 (9th Cir. 2003), the court stated that  "[e]ven though the concept of a cooperative Conservation Agreement is attractive, and ought to be encouraged, federal agencies cannot delegate the protection of the environment to public-private accords. Even given the cooperation of private entities, the agencies must vigilantly

and independently enforce environmental laws." Similarly, in *United States Telecom Association v. FCC*, the court held that "while federal agency officials may subdelegate their decision-making authority to subordinates absent evidence of contrary congressional intent, they may not subdelegate to outside entities-private or sovereign-absent affirmative evidence of authority to do so." 359 F.3d 554, 566 (D.C. Cir. 2004).

In *Perot v. FEC*, the court found that when Congress has delegated authority to an agency to establish rules and regulations regarding a statute, "it may not shift that responsibility to a private actor." 97 F.3d 553, 559 (D.C. Cir. 1996). In this case, however, the court found that the FEC had not illegally delegated its power. The court explained that the FEC "has issued a regulation permitting eligible non-profit organizations to stage candidate debates, provided that they employ 'pre-established objective criteria' to determine who may participate. Rather than mandating a single set of 'objective criteria' all staging organizations must follow, the FEC gave the individual organizations leeway to decide what specific criteria to use." *Id.* at 102. The plaintiff argued that allowing organizations to establish their own criteria was an unlawful delegation of the agency's power; the court disagreed. *Id.* The court explained, "[t]he contention that the regulation delegates authority to the [private organization] because it does not spell out precisely what the phrase 'objective criteria' means goes far beyond the normal usage of the term 'delegation'" *Id.*

In *National Park & Conservation Association v. Stanton*, the Park Service established a management plan for the Niobrara National Scenic River that delegated a variety of duties concerning the management of the area to an independent local council. 54 F.Supp.2d 7, 10-11 (D.D.C. 1999). The council managed the River under a Cooperative Agreement with the Fish & Wildlife Services. *Id.* at 11. The court rejected the Park Service's argument that the Service

retained "ultimate accountability and authority" for the management of the River, finding the EIS and Cooperative Agreement "provide[d] no explanation of how [the park service] can exercise this authority." *Id.* At 21. The court went on to say, the "only authority over the council appears to be [the Park Service's] ability to terminate the Cooperative Agreement, a draconian remedy that [the agency] would be unlikely to exercise except in an extreme situation." *Id.* The court held that this was an unlawful delegation, despite the fact that Congress had explicitly encouraged "state and local involvement in the administration and management" of the River. *Id.* at 10.

The case at bar is most similar to *Stanton*. 54 F.Supp.2d 7 (D.D.C. 1999). Similarly to the case in *Stanton*, here, the agency has delegated significant authority to a private organization, the NWTF. While the Forest Service argues that it has control over the NWTF and the farmers or permittees, the Court is unsure how much control the Forest Service has over these entities. The Stewardship Agreement states that the Forest Service may terminate the agreement and establishes the requirements for the operations of the NWTF and its permittees; however, nowhere does the Agreement address enforcement of any law or regulation by the Forest Service. Again, similarly to *Stanton*, Congress authorized the Stewardship agreement; however, the Agreement between the NWTF and the Forest Service is not without bounds and the Court may find unlawful delegation as in *Stanton*.

In response to FSEEE's argument regarding the delegation doctrine, the Forest Service contends that the amount of delegation it allowed in the Stewardship Agreement was in line with its interpretation of the Stewardship Act. The Forest Service reasons that, under the *Chevron* standard, the agency's interpretation of the Stewardship Act is entitled to great deference and should be held by this Court to be reasonable. The Forest Service goes on the conclude, holding the

interpretation of the Forest Service reasonable results in a finding that the delegation under the Agreement is likewise reasonable.

The *Chevron* standard requires the court to accord great deference to an agency when interpreting ambiguities in statutes within the agency's jurisdiction. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 865-66 (1984). "If a statute is ambagious, and if the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statue, even if the agency's reading differs from what the court believes is the best statutory interpretations." *National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 980 (2005) (citing *Chevron*, 467 U.S. at 843-44; n. 11).

Generally, a statute is ambiguous if there is more than one reasonable interpretation. *Central Bank & Trust Co. v. Kincaid*, 617 S.W.2d 32, 33 (Ky. 1981) (an ambiguous document is "one capable of more than one different, reasonable interpretation" ); *State, Dept. of Ecology v. Campbell & Gwinn, L.L.C.*, 43 P.3d 4, 12 (Wash.2002) (an ambiguous statute is one capable of more than one reasonable meaning). Looking to the Stewardship Act, the Court finds it is ambiguous regarding the amount of authority the Forest Service may delegate in order to "achieve land management goals" and "met local and rural community needs." Act of October 21, 1998, Pub. L. 105-277, Sec. 347, 112 Stat. 300 (not codified), as amended, Act of February 20,2003, Pub.L. 108-7, Sec 323, 117 Stat. 275 (not codified).

The land management goals stated in the Stewardship Act are broad enough to encompass both commercial and private farming: "the land management goals of a project under subsection (a) [of this note] may include, *among other things*– . . . soil productivity . . . ." *Id.* (emphasis added). Applying *Chevron's* standard of great deference to the agency's interpretation, it would, therefore,

be reasonable for the Forest Service to believe that a stewardship agreement may be entered into regarding farming at LBL. However, the Court finds that, even in light of great deference to the agency, it was unreasonable for the Forest Service to delegate the authority to issue special-use permits in direct violation of its regulations. While it is a reasonable interpretation of the Stewardship Act that the Forest Service may enter a stewardship agreement with NWTF regarding the land management goal of farming and farm land management, it is not a reasonable interpretation of the Stewardship Act that the Forest Service is authorized to delegate its responsibility to issue special-use permits and therefore violate its own regulations. Such an unreasonable interpretation is not entitled to be accepted by this Court under the *Chevron* standard.

The Court finds that the regulations promulgated pursuant to the OAA require the special-use permits to be issued for farming LBL property and the permits must be issued by an authorized officer. An authorized officer is expressly defined as an employee of the Forest Service. The Stewardship Agreement clearly sets out that "any NWTF employees and their volunteers shall not be deemed to be Federal employees for any purposes." The Court finds Forest Services' interpretation of the Stewardship as authorizing delegation to the NWTF of the power to issue special-use permits is an unreasonable interpretation of the Stewardship Act as it is in direct violation of the regulations promulgated under the authority of the OAA. The delegation of such power by the Forest Service constitutes unlawful delegation of the agency's duty to protect the environment to a private entity as in *National Park & Conservation Ass'n v. Stanton*, 54 F. Supp.2d 7 (D.D.C. 1999). While the Forest Service has provided evidence of Congressional authority to enter into stewardship agreements with private entities, the Forest Service has been unable to show affirmative evidence of Congressional authority to delegate so extensively in direct violation of its

regulations.  *United States Telecom Association v. FCC*, 359 F.3d 554, 566 (D.C. Cir. 2004).

## CONCLUSION

The Plaintiffs Motion for Summary Judgment is GRANTED in part and DENIED in part and Defendant's Motion for Cross Summary Judgment is GRANTED in part and DENIED in part.   The Court finds the Forest Service did not violate NEPA by failing to create an EIS; however, the Forest Services' interpretation of the Stewardship Act as authorizing delegation to the NWTF of the power to issue special-use permits is an unreasonable interpretation of the Stewardship Act as it is in direct violation of the regulations promulgated under the authority of the OAA and such delegation constitutes unlawful delegation.   An appropriate order shall issue.